## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ONH AFC CS INVESTORS, LLC, *et al.*, | Case No. 23-10931 (CTG) |
| Debtors. | |
| ANNA PHILLIPS, in her capacity as Liquidating Trustee of the ONH Liquidating Trust, | Adv. Proc. No. 24-50085 (CTG) |
| Plaintiff, | **Related Docket No. 9** |
| v. | |
| JOSMIC 2 LLC and JOSMIC HOLDINGS LLC, | |
| Defendants. | |

## MEMORANDUM OPINION

At common law, fraudulent conveyance was a remedy available to creditors. Similar to a creditor's right to levy a debtor's assets to satisfy a judgment, if a debtor conveyed assets to a third party to hinder, delay, or defraud creditors, those creditors could assert a fraudulent conveyance claim against the recipient of a fraudulent conveyance. That action sought to reach the property that would have otherwise been available to satisfy their claims had the transfer not occurred.[1] The Bankruptcy Code gives the trustee this same power to avoid and recover fraudulent conveyances in bankruptcy that creditors had outside of bankruptcy. It does so both through § 548,

---

[1] *See generally Neshewat v. Salem*, 365 F. Supp. 2d 508, 521 (S.D.N.Y. 2005) (discussing common law fraudulent conveyance remedy as codified under New York law).

which creates a federal fraudulent conveyance cause of action, and through § 544(b)(1), which gives the trustee the same right to avoid transfers that a creditor holding an "allowable" claim would have had before the bankruptcy filing.

May a bankruptcy trustee exercise this power when the beneficiaries of a successful claim will not be creditors, but will instead be the debtor's equity holders? The court in *DSI Renal* persuasively explained that, at least under Third Circuit precedent, the answer to that question is no.[2] Because outside of bankruptcy the fraudulent conveyance remedy is available only to creditors, to permit a trustee to pursue a fraudulent conveyance claim that would benefit equity holders would give those holders rights "to which they were not entitled outside [of] bankruptcy."[3] And "nothing in the Bankruptcy Code" provides a reason for doing that.[4]

The current dispute presents a variant on that question. One of the debtors in this bankruptcy case allegedly raised approximately $44 million from investors based on representations that the funds would be used to develop a real estate project at the Atlanta Financial Center.[5] It is further alleged that after the funds were raised, they were dissipated from the debtors' bank accounts. Consistent with § 510(b) of the Bankruptcy Code, the confirmed plan in this bankruptcy case effectively treats the defrauded investors as equity holders, not creditors. There is evidence before the

---

[2] *In re DSI Renal Holdings, LLC*, No. 14-50356, 2020 WL 550987 (Bankr. D. Del. Feb. 4, 2020).

[3] *Id.* at *7.

[4] *Id.*

[5] D.I. 1 ¶ 40.

Court that suggests that the liquidating trustee has already recovered sufficient funds from the debtors' principal to pay the remaining debt in full – though that is not alleged in the complaint and therefore may not be considered on a motion to dismiss.  Everyone agrees, however, that most of the investors' losses have not been compensated.

Before the bankruptcy filing, the debtors' principal had taken out a $5 million personal loan.  The lenders contend that the debtors' principal was supposed to use the loan proceeds in connection with the Atlanta Financial Center project.  Although the debtor was not an obligor on that loan, it is alleged that the debtor used its assets to pay off that loan.  In this adversary proceeding, the trustee contends that those payments, along with other payments the debtor allegedly made to the lenders, can be avoided and recovered as fraudulent conveyances.[6]  The defendants, pointing to the evidence that creditors have been paid in full, argue that the Court should stay the case to permit them to seek summary judgment under the rationale of *DSI Renal*.

The Court will deny the motion to stay these proceedings.  There are persuasive reasons, including those set forth in *DSI Renal*, to believe that the remedy of fraudulent conveyance should not be available for the benefit of equity holders.  If it is true that the investors were induced to invest based on false representations, then outside of bankruptcy, those defrauded investors were creditors who would have

---

[6] The plaintiff in this adversary proceeding is Anna Phillips, who is the liquidating trustee of the trust established under the confirmed plan of reorganization in the bankruptcy case.  The defendants are Josmic 2 LLC, which is referred to as "Josmic 2," and Josmic Holdings LLC, which is referred to as "Josmic Holdings" and, together with Josmic 2, as "Josmic."

held fraud claims against the debtor.  In order to recover on those claims, the investors would have been able to pursue state law fraudulent conveyance actions. And while it is true that, in bankruptcy, their claims are subordinated under § 510(b), fairly understood, that subordination does not operate to strip the trustee in bankruptcy of the ability to bring a fraudulent conveyance action for their benefit.

The defendants also move to dismiss the fraudulent conveyance claims on the merits.  For the reasons described below, that motion will be granted in part and denied in part.

### Factual and Procedural Background

Elchonon Schwartz formed ONH AFC in 2022 to invest in commercial real estate.[7]  Schwartz owned and managed several commercial real estate investment companies and organized these entities under One Night or the Nightingale entities.[8] ONH AFC was managed by One Night.[9]

ONH AFC raised equity to fund the purchase of the Atlanta Financial Center.[10] To fund the proposed acquisition, the debtors relied on (1) equity raised from investors through securities offerings listed on CrowdStreet, an online brokerage platform, (2) equity raised from other investors, (3) contributions from the

---

[7] D.I. 1 ¶ 19.  Debtor ONH AFC CS Investors LLC is referred to as "ONH AFC."  The facts set forth herein are based on allegations of the complaint (D.I. 1), which are taken as true for the purposes of this motion to dismiss.

[8] *Id.*  One Night Holdings, LLC is referred to as "One Night" and One Night Holdings LLC and The Nightingale Group, LLC, are referred to collectively as the "Nightingale entities."

[9] *Id.* ¶ 22.

[10] *Id.* ¶ 20.

4

Nightingale entities, and (4) senior secured debt.[11]  ONH AFC raised roughly $44 million from 654 CrowdStreet investors.[12]  CrowdStreet investors were informed that all proceeds from the ONH AFC offering were to be used for the "purchase, lease, reposition, and [renovation]" of the Atlanta Financial Center.[13]  All funds raised were to be held in segregated accounts until the closing of the purchase.[14]  If the deal failed to close, the funds were to be returned to investors.[15]

The structure of the proposed acquisition had some complexity.  In substance, under the contemplated transaction a "Prop. Co." – a non-debtor entity named ONH AFC LLC – was to acquire the underlying Atlanta Financial Center assets.[16]  Prop. Co. would in turn be acquired by AFC Mezz.[17]  And AFC Mezz would be held by the debtor ONH AFC.[18]

The complaint, filed by Anna Phillips in her present capacity as the trustee of the post-confirmation liquidating trust established in this bankruptcy case, alleges that although funds were raised from investors, the contemplated transaction did not close.[19]  The complaint asserts that both ONH AFC and Schwartz "made untrue

---

[11] *Id.* ¶ 21.  CrowdStreet, Inc. is referred to as "CrowdStreet."

[12] D.I. 1 ¶ 40.

[13] *Id.* ¶ 34.

[14] *Id.* ¶ 28.

[15] *Id.* ¶ 35.

[16] *Id.* ¶ 44.  ONH AFC LLC, whose name is confusingly similar to that of the debtor entity, ONH AFC CS Investors, LLC, is referred to as "Prop. Co."

[17] D.I. 1 ¶ 44.  ONH AFC CS Mezz, LLC is referred to as "AFC Mezz."

[18] D.I. 1 ¶ 44.

[19] *Id.* ¶¶ 45-46.

statements of fact and/or omitted statements of material[] facts to investors in connection with the AFC Offering" including with respect to Schwartz's "intended use of the funds from the Offering."[20]  And, upon her pre-petition appointment by investors as the independent manager of ONH AFC, Phillips discovered that the funds raised from investors had been withdrawn and dissipated.[21]

Debtor ONH AFC, together with debtor ONH 1601, another of Schwartz's failed real estate investment ventures, filed for bankruptcy in July 2023.[22]  The debtors' joint plan was confirmed and the ONH liquidating trust was granted the authority to pursue estate claims and actions.[23]

It is alleged that, back when Schwartz was running the debtors' businesses, ONH AFC made five transfers that are now challenged as fraudulent conveyances. The largest of those transfers was a $5 million payment made in June 2022 to Josmic. It is alleged that this payment paid off a personal loan that Josmic had previously made to Schwartz.[24]  The complaint also alleges that Schwartz caused the rights to the Atlanta Financial Center purchase agreement (which were presumably held by Prop. Co., a non-debtor) to be transferred to Josmic.[25]

---

[20] *Id.* ¶ 50.

[21] *Id.* ¶¶ 23, 51-53.

[22] *Id.* ¶ 54.

[23] D.I. 1 ¶ 56.

[24] *Id.* ¶¶ 59, 71, 73.

[25] *Id.* ¶¶ 42, 59.

In addition, the complaint alleges that ONH AFC made four other transfers totaling $2 million:

- A $500,000 transfer in June 2022 to "Riverside Abstract as escrow agent (for the benefit of [Josmic])";

- A $500,000 transfer in July 2022 to "Riverside Abstract as escrow agent (for the benefit of [Josmic])";

- A $750,000 transfer in September 2022 to "Riverside Abstract as escrow agent (for the benefit of [Josmic])"; and

- A $250,000 transfer in September 2022 to Josmic Holdings.[26]

The complaint contains very little detail about the reasons for, or the nature of, these alleged transfers.

Defendants moved to dismiss the complaint for failure to state a claim.[27] Defendants also asked, in the alternative, for the case to be stayed pending the outcome of the plaintiff's efforts to recover against Schwartz.[28]  The gist of the defendants' argument for a stay is that under the rationale of *DSI Renal*, fraudulent conveyance claims may only be asserted where the beneficiaries of those claims will be creditors.  And the defendants argued that it appeared, based on various publicly filed materials, that the trustee was close to having recovered sufficient funds from others to permit the payment of creditors in full.[29]  In order to understand the factual

---

[26] *Id.* ¶ 71. Josmic Holdings LLC is referred to as "Josmic Holdings."

[27] D.I. 9.

[28] D.I. 10 at 23-28.

[29] *Id.* at 26.

predicate for that argument, during the argument on the motion the Court asked the trustee to provide an update on the status of claims and distributions under the plan. The trustee helpfully provided that information.[30]   In substance, it shows that the trustee is still reconciling certain of the claims that have been asserted.   Most importantly, however, it shows that the trustee has already paid more than $8 million to the classes that are made up of the defrauded investors, who (pursuant to § 510(b) of the Bankruptcy Code) are effectively treated as equity holders under the confirmed plan.[31]   It necessarily follows from the trustee's having made a distribution to that junior class that she is confident that, when the claims are fully reconciled, she has or will have sufficient funds to pay all allowed creditor claims in full.

## Jurisdiction

The trustee asserted claims for fraudulent conveyance and unjust enrichment. The fraudulent conveyance claims arise under the Bankruptcy Code (§§ 544, 548 and 550) and are thus within the district court's "arising under" jurisdiction set out in 11 U.S.C. § 1334(b).   The unjust enrichment claim is within the district court's § 1334(b) "related to" jurisdiction.   These cases have been referred to this Court under

---

[30] D.I. 27-1.  While the information provided in that submission may not be considered in connection with the motion to dismiss, which of course, is limited to the factual allegations made in the complaint, the Court may consider this information in connection with the defendants' request for a stay.  *See Koa Pharmaceuticals v. Andrx Corp.* 369 F.3d 700, 719 (3d Cir. 2004) (in deciding whether to grant a stay, courts are not limited to considering only evidence that is strictly admissible but may also "exercise their discretion" to consider "affidavits or other hearsay materials" based on the "facts and circumstances of a given case."); Charles Alan Wright and Arthur Miller, *Federal Practice and Procedure* § 2949 (same).

[31] D.I. 27-1.

28 U.S.C. § 157(a) and the February 29, 2012 Standing Order of Reference of the United States District Court for the District of Delaware.

## Analysis

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."[32]  Because a request to stay a proceeding (addressed in Part I of this Memorandum Opinion) is akin to a request for a preliminary injunction, courts consider whether the traditional standards for granting injunctive relief have been met.[33]

With respect to the motion to dismiss (addressed in Part II), the Court must determine whether the complaint's factual allegations are sufficient to state the claims alleged.  The Federal Rules of Civil Procedure require only a "short plain statement of the claim showing that the pleader is entitled to relief."[34]  Civil Rule 9 requires particularity when the plaintiff alleges fraud or mistake, but intent and knowledge may be alleged generally.[35]  The purpose is to place defendants fairly on notice of the conduct charged in the case.

Giving effect to the Supreme Court's decisions in *Iqbal* and *Twombly*, the Third

---

[32] *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  *See also Alameda Research Ltd. v. Kives*, No. 23-50411 (JTD), 2024 WL 717771, at *1 (Bankr. D. Del. Feb. 21, 2024) (citing § 105(a) of the Bankruptcy Code as the source of authority for granting such a stay).

[33] 2 *Collier on Bankruptcy* ¶ 105.03 (16th ed. 2025).

[34] Fed. R. Civ. P. 8(a)(2) made applicable by Fed. R. Bankr. P. 7008.

[35] Fed. R. Civ. P. 9(b) made applicable by Fed. R. Bankr. P. 7009.

Circuit has set forth a two-step analysis for a court's consideration of a motion to dismiss.[36] *First*, the court should separate the factual and legal elements of a claim, accepting all well-pleaded facts as true while disregarding any legal conclusions. *Second*, the court is to assess whether the facts alleged are sufficient to show a plaintiff has a plausible claim for relief.[37]

## I.   While the Court is persuaded by the reasoning of *DSI Renal*, in the circumstances present here it does not provide a reason to stay this lawsuit.

The defendants argue that *DSI Renal* precludes recovery on the trustee's fraudulent conveyance claims because all remaining creditors are expected to be paid in full.   Additional recoveries will only serve to benefit equity holders or § 510(b) subordinated claimholders.   Appreciating that the complaint contains no allegations about the trustee having recovered sufficient funds to pay the holders of all valid debt claims in full, the motion to dismiss does not contend that *DSI Renal* provides a basis for dismissing the complaint.[38]   Instead, the motion now before the Court invokes *DSI Renal* only for the purpose of seeking a stay of the lawsuit.   Moreover, since the filing of the motion to stay the trustee has filed a supplemental pleading that effectively acknowledges that the creditor claims that have been allowed in the bankruptcy case

---

[36] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009).

[37] *Fowler*, 578 F.3d at 210-211.

[38] While defendants do suggest, in their supplemental pleading, that the complaint can be dismissed in light of the statements made in the trustee's report, making such use of the trustee's report would not be appropriate on a motion to dismiss.   *See Southern Cross Overseas v. Wah Hwong Shipping,* 181 F.3d 410, 426 (3d Cir. 1999).

will be paid in full.[39]  Accordingly, if the fraudulent conveyance remedy is unavailable for the purpose of providing recoveries to the allegedly defrauded investors, the defendants would presumably be able to file a motion in short order seeking summary judgment on that basis.  If the Court were of the view that the case could easily be resolved that way, then staying further proceedings to permit such a motion to be filed would make good sense.

This Court is persuaded by the core reasoning of *DSI Renal* on the merits of the issue addressed in that opinion.  Fraudulent conveyance is a creditor's remedy. Where the beneficiary of a bankruptcy trustee's fraudulent conveyance action is a party that would not have been able to assert a fraudulent conveyance claim against the defendant immediately before the bankruptcy, it would make no sense (for the reasons *DSI Renal* explains) to permit a bankruptcy trustee to assert a fraudulent conveyance claim for the benefit of that party.

The problem for the motion to stay, however, is that this is not such a case. The record in this case suggests that the beneficiaries of the fraudulent conveyance action were investors who were defrauded into purchasing equity interests in the debtor.  While those equity holders' claims for fraud are subordinated in bankruptcy under § 510(b) and thus treated as equity interests, that fact is not controlling for the purposes of the rule of *DSI Renal*.  Properly understood, that rule does not turn on the allowance, classification, or treatment of the claims *in bankruptcy*.  Rather, it is focused on whether the beneficiaries of the fraudulent conveyance action would have

---

[39] D.I. 27-1.

had the right to assert fraudulent conveyance claims *outside of bankruptcy*. Because, outside of bankruptcy, an investor who is the victim of fraud is a creditor that may assert a state law fraudulent conveyance claim, there is no reason why a bankruptcy trustee should not be able to bring a fraudulent conveyance claim for the benefit of that investor.

### A. Fraudulent conveyance was a creditors' remedy outside of bankruptcy and may only be used in bankruptcy for the benefit of creditors.

The court in *DSI Renal* granted a motion for partial summary judgment that capped the trustee's recovery on a fraudulent conveyance action at the amount necessary to pay creditors in full.[40]  That was a case under chapter 7 in which the debtors had approximately $166 million of debt.  The chapter 7 trustee sought to recover $678 million from parties alleged to have received a fraudulent conveyance. The trustee's position was that if he were to prevail on the claim, he would be able to distribute, consistent with § 726(a)(6), the amount in excess of $166 million back to the debtors, who would presumably then distribute it to their equity holders.

The court disagreed.  The opinion explains that while the transfers may be avoidable under §§ 544 or 548, the trustee's recovery is governed by § 550, which permits recovery "for the benefit of the estate."  And *DSI Renal* read the Third Circuit's decisions in *Messina*, *Majestic Star Casino*, and *Cybergenics* to stand,

---

[40] *DSI Renal Holdings*, 2020 WL 550987, at *5-6.

collectively, for the proposition that this language should be understood to mean "for the benefit of creditors."[41]

The *DSI Renal* court's reading of this Third Circuit precedent is persuasive. Even if, however, those precedents might be read more narrowly, there is an alternative rationale that would also support the *DSI Renal* court's conclusion. At common law, fraudulent conveyance was a remedy that was designed to protect creditors and could be invoked only by creditors. Outside of bankruptcy, if a corporation dissipates its assets to the detriment of creditors, those creditors can sue the transferee and seek to recover the transfers for the purpose of satisfying their claims against the corporation. That same dissipation might give rise to a claim by a shareholder for breach of fiduciary duty against the corporation or its directors. But there is no suggestion that a shareholder whose equity interest had declined in value because of the company's dissipation of assets can assert a fraudulent conveyance claim against a transferee, seeking to recover the transfer and thus restore the value of its equity interest. There is no reason to believe that Congress, when it imported this common law remedy into the Bankruptcy Code, would have intended it to operate for the benefit of equity holders for whom the remedy was unavailable outside of bankruptcy.

The Supreme Court has repeatedly pointed to a "longstanding interpretive principle" under which, when a statutory provision is "obviously transplanted from

---

[41] *Id.* at *6-8 (citing *In re Cybergenics Corp.*, 226 F.3d 237, 243-247 (3d Cir. 2000); *In re Messina*, 687 F.3d 74 (3d Cir. 2012); *In re Majestic Star Casino, LLC*, 716 F.3d 736 (3d Cir. 2013)).

another legal source," it "brings the old soil with it."[42]  So in *Taggart*, the Court found that because the Bankruptcy Code's discharge injunction is written as an "injunction," it should be read to "incorporate the traditional standards in equity practice for determining when a party may be held in civil contempt for violating an injunction."[43]

Justice Frankfurter's original articulation of the overarching principle of statutory construction is instructive:

> Words of art bring their art with them.  They bear the meaning of their habitat whether it be a phrase of technical significance in the scientific or business world, or whether it be loaded with the recondite connotations of feudalism.  Holmes made short shrift of a contention by remarking that statutes used "familiar legal expressions in their familiar legal sense."  The peculiar idiom of business or of administrative practise often modifies the meaning that ordinary speech assigns to language.  And if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.[44]

That principle is controlling.  The common law remedy of fraudulent conveyance was available to benefit creditors, not the debtor itself or its owners.  Section 544(b) of the Bankruptcy Code gives the trustee in bankruptcy the same authority to avoid a fraudulent conveyance that creditors would have had at the time

---

[42] *See, e.g., Taggart v. Lorenzen*, 587 U.S. 554, 560-561 (2019).  *See also United States v. Hansen*, 599 U.S. 762, 778 (2023).

[43] *Taggart*, 587 U.S. at 561.  *See also Hall v. Hall*, 584 U.S. 59, 73 (2018) (relying on statutory predecessor of Rule 42(a) in construing the subsequent rule); *Field v. Mans*, 516 U.S. 59, 69-70 (1995) (looking to the elements of fraud at common law to determine the level of reliance necessary to show that a debt is nondischargeable under § 523(a)(2) because it is for money obtained by fraud).

[44] Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

of the bankruptcy filing.  And § 548 also creates a federal statutory cause of action to avoid fraudulent conveyances.  Once a conveyance is "avoided" under either §§ 544(b) or 548, the trustee may recover it, under § 550, "for the benefit of the estate."  The *DSI Renal* court makes a fair argument that under Third Circuit precedent, those words mean "for the benefit of creditors."  But even if the Third Circuit cases might be read more narrowly, the "old soil" of the creditor's remedy of fraudulent conveyance would strongly suggest that, at the very least, when a trustee seeks to recover under § 550 *on a claim for fraudulent conveyance*, the term "for the benefit of the estate" should be understood to mean for the benefit of creditors.

## B.     *Moore v. Bay* does not require a contrary conclusion.

In *Moore v. Bay*, a case that arose under the prior Bankruptcy Act, the Supreme Court held that a bankruptcy trustee could bring an action to avoid a lien for the benefit of *all* creditors, despite the fact that some of the creditors who would benefit from the avoidance could not have brought the action themselves under non-bankruptcy law.[45]  There is no doubt that the Bankruptcy Code codifies language drawn from *Moore v. Bay*.  Section 544(b) permits a bankruptcy trustee to bring a fraudulent conveyance action to avoid a transfer if any holder of an "allowable" claim could have sought to avoid the transfer under applicable state law before the bankruptcy filing.  And § 550 permits the trustee to recover the avoided transfer "for the benefit of the estate."  That language is drawn from *Moore v. Bay* and means that the proceeds of the recovery are to be shared with *all* creditors, not just those who

---

[45] *Moore v. Bay*, 284 U.S. 4 (1931).

could have brought the claim under non-bankruptcy law. The question is whether the language "for the benefit of the estate," when used in § 550, goes further than that, also allowing the trustee to pursue fraudulent conveyance claims once all creditors are paid in full. While there are decisions that adopt that more expansive reading of *Moore v. Bay*, this Court is persuaded by the analysis of *DSI Renal* that nothing in *Moore v. Bay* itself requires that result.

While the Supreme Court's (nearly inscrutable) *Moore v. Bay* decision never says so, the Ninth Circuit decision that the Supreme Court reviewed there explains that the statutory provision at issue was § 70e of the prior Bankruptcy Act, which – like the modern § 544(b) – granted the trustee in bankruptcy the same right to avoid a transfer that a creditor would have had outside of bankruptcy.[46]

The specific question in *Moore v. Bay* arose out of a provision of California law under which a mortgage was void as against those who became creditors before the mortgage was recorded, but valid against those who became creditors afterwards.[47]

---

[46] *See In re Sassard & Kimball*, 45 F.2d 449, 450 (9th Cir. 1930) (quoting § 70e as providing that the "trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was *bona fide* holder for value prior to the date of the adjudication.").

[47] *Id.* (describing § 3440 of the Civil Code of California and decisions of the Supreme Court of California construing the statute). Significantly, it appears that California law treated the mortgage in question as voidable by an *unsecured* creditor that became a creditor before the mortgage was recorded. Under current non-bankruptcy law, it is typically the case that only a secured creditor or *bona fide* purchaser would have priority over a prior unperfected lien or mortgage. *See* U.C.C. §§ 9-322(a)(1) and 9-317(a)(2). *See also In re Huffman*, 408 F.3d 290, 293 (6th Cir. 2005); *McCannon v. Marston*, 679 F.2d 13 (3d Cir. 1982). For that reason, the ability to set aside a mortgage relies on § 544(a) of the Bankruptcy Code rather than § 544(b). *See generally* Charles Jordan Tabb, *Law of Bankruptcy* 494-506 (6th ed. 2024) (explaining the different work done by §§ 544(a) and 544(b) and discussing the challenge presented by *Moore v. Bay*).

16

If the trustee avoids the mortgage, should the value of the now unencumbered asset be made available to all creditors, or just those who held the non-bankruptcy right to avoid the mortgage? The Ninth Circuit held that those proceeds should be distributed *only* to those creditors against whom the mortgage was invalid. On the Ninth Circuit's view, those creditors against whom the mortgage was valid should *not* benefit from the trustee's avoidance of the mortgage.[48]

The Supreme Court reversed, concluding that once the mortgage was avoided, the value of the asset should be distributed to *all* creditors. The terse opinion comprises two paragraphs. The key sentence states that "[t]he rights of the trustee … are to be enforced for the benefit of the estate…. [T]he language of the Bankruptcy Act appears to us to imply very plainly, that what thus is recovered for the benefit of the estate is to be distributed [*pro rata*] on all allowed claims, except such as have priority or are secured."[49]

The "codification" of *Moore v. Bay* in the current Bankruptcy Code, however, creates an analytic puzzle. There is a principle of statutory construction under which the drafters of the 1978 Code are presumed to have intended to carry forward pre-Code practice in absence of statutory language saying otherwise.[50] So even without

---

[48] *Id.* ("The Trustee indeed represents all creditors, but only as their respective interests in the property under administration were fixed by local law when the bankruptcy proceedings intervened, and it is his duty to administer and distribute accordingly as he finds at that time liens or inferiorities of respective creditors were established. If at that time any creditors had no inchoate right under existing state laws to reduce his claim to judgment and thereby establish a lien by execution superior to an existing and recorded mortgage, he is bound in distribution to recognize the latter's superior position.").

[49] *Moore*, 284 U.S. at 5.

[50] *See, e.g.*, *Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998).

the 1978 Code's express use of the "for the benefit of the estate" language, the authority to avoid unperfected liens provided in § 544, coupled with the Bankruptcy Code's direction that estate property be distributed in accordance with statutory priority (except to the extent the terms of a confirmed plan provide otherwise), would mean that the proceeds of an avoided lien would be distributed to all creditors.

The Bankruptcy Code, however, *does* use the expression drawn from *Moore v. Bay* "for the benefit of the estate." But it uses that language in § 550, which deals with the affirmative recovery from a third party of an avoided transfer, a circumstance that was not presented in *Moore v. Bay* itself (which simply involved the avoidance of a lien).

What is one to make of that? The *Tronox* court makes a great deal of it, concluding that it reflects an intent by Congress to adopt a rule of "complete avoidance," even when it would permit the assertion of a fraudulent conveyance claim for the benefit of equity holders.[51] And in defense of the *Tronox* reading, one can certainly analogize the equity holders who would benefit from a fraudulent conveyance case to the creditors in *Moore v. Bay* who extended credit after the lien was properly perfected. Outside of bankruptcy, they would have had no right to any recovery. Permitting the trustee to recover for their benefit in bankruptcy would provide those parties with a windfall to which they are not otherwise entitled. But that is what *Moore v. Bay* permitted. The same rationale, it could be said, might be

---

[51] *In re Tronox*, 464 B.R. 606, 616 (Bankr. S.D.N.Y. 2012).

offered in defense of permitting the fraudulent conveyance lawsuit that benefits equity holders.

But *Moore v. Bay* does not *require* such an expansive reading. A potentially important point that *Tronox* misapprehends is that *Moore v. Bay* did not arise in the fraudulent conveyance context. Instead, it involved the avoidance of a lien that had not been properly perfected.[52]  *Moore v. Bay* did say that the lien was avoided in its entirety and that the unencumbered value was to be distributed to all creditors, not just those who could have themselves avoided the lien outside of bankruptcy. But critically, the beneficiaries of that action were creditors, not the holders of equity in the debtor.

For that reason, *Moore v. Bay* does not require the broad reading given to it in *Tronox* – that "for the benefit of the estate" necessarily means that any avoided transfer is recovered in full without regard to principles of non-bankruptcy law. The case is also fairly amenable to the narrower reading offered by the *DSI Renal* court. On that view, *Moore v. Bay* means that recovery, following a successful avoidance action brought under § 544(b) (which permits the trustee to assert an avoidance action that could have been brought outside of bankruptcy by a creditor) extends beyond the triggering creditors. The recovery is not for the exclusive benefit of those triggering creditors. Rather, it is "for the benefit of the estate." On this narrower reading, nothing in *Moore v. Bay* requires the conclusion that the trustee in

---

[52] *Tronox* was thus mistaken when it said that the Supreme Court, in *Moore v. Bay* "allowed a trustee to avoid a fraudulent transfer without regard to the size of the claim of the creditor whose rights and powers the trustee was asserting." *Tronox*, 464 B.R. at 616.

bankruptcy may affirmatively recover amounts that could not have been recovered by *any* creditor outside of bankruptcy.[53]

This Court is persuaded by the case for the narrower reading. In addition to the persuasive force of the opinion in *DSI Renal*, the principle that terms of art transplanted from the common law carry with them their old soil is significant here. As described above, fraudulent conveyance was historically a remedy available for creditors. It permitted them to recover on their claim, and nothing further. It makes good sense that creditors should be able to recover in bankruptcy whatever would have been available to them outside of bankruptcy.[54] And for this reason, it is unsurprising that Congress would give the trustee the same power that creditors otherwise had to avoid and recover fraudulent conveyances. But to allow the remedy to be used to benefit equity holders would unmoor it from its historical foundations. Because *Moore v. Bay* does not require that conclusion, this Court agrees with *DSI*

---

[53] The court in *DSI Renal* distinguished *Tronox* and other cases that have adopted the broader reading of *Moore v. Bay* on the ground that those cases involved lawsuits brought by reorganized debtors or post-confirmation trusts that would distribute all of the proceeds to creditors, rather than distributing the proceeds to equity holders. *See DSI Renal,* 2020 WL 550987, at *8. This Court is not certain that this distinction is one that ought to make a difference. If the fraudulent conveyance claims in those cases, before confirmation of a plan, were subject to caps on the ground that recovery was not available for the benefit of equity holders, it is difficult to see why a plan of reorganization should effectively grant a reorganized debtor or liquidation trust greater rights than those held by the estate before the plan was confirmed.

[54] *Cf. United States v. Miller*, 145 S. Ct. 839, 847-848 (2025) ("[T]he 'actual creditor' requirement serves as an important check on the trustee's § 544(b) powers. Absent the actual-creditor requirement, a trustee could use § 544(b) to unwind transactions that would never actually be at risk of invalidation outside of bankruptcy proceedings. The actual-creditor requirement thus mitigates the disruptive potential of a trustee's avoidance power by ensuring that the trustee has no greater rights of avoidance than the actual creditor would have if that creditor were asserting invalidity on its own behalf.") (internal citations and quotations omitted).

*Renal* that the case should be read more narrowly. The Court thus concludes that a bankruptcy trustee's recovery on a fraudulent conveyance claim cannot exceed the total value of the valid claims against the bankruptcy estate.

> ### C.  Defrauded investors, whose claims are subject to subordination under § 510(b), should be considered "creditors" for purposes of the principle that fraudulent conveyance is not available for the benefit of equity holders.

The defendants argue that the application of the principles described above means that they will be entitled to summary judgment. Here, the trustee has already recovered sufficient funds to pay the debtors' creditors in full. On that basis, the defendants suggest that this Court ought to stay the proceedings to permit them to seek summary judgment.

The premise of that argument, however, is that the reasoning of *DSI Renal* limits fraudulent conveyance claims to the amount necessary to satisfy in full those claims that are "allowed" in the bankruptcy case and are not subject to subordination under § 510(b). That premise is incorrect. Regardless of the treatment a defrauded investor may receive in bankruptcy, outside of bankruptcy such an investor was a creditor that would have had the right to assert a fraudulent conveyance claim. Under the "old soil" approach to the *DSI Renal* rule, the trustee's ability to assert fraudulent conveyance claims is capped once the trustee has recovered sufficient value to satisfy, in full, the amounts the debtor owed to those who could have asserted fraudulent conveyance claims against the debtor immediately before the bankruptcy filing plus any other claims that are allowed in the bankruptcy case. Here, there is no suggestion that the trustee's recoveries to date are sufficient to pay the amounts

the debtor owed to the defrauded investors immediately before the bankruptcy. The cap therefore does not apply here.

Section 510(b) subordinates to the level of equity a claim arising out of the purchase or sale of a security.[55] At least in its paradigmatic application, that principle makes good common sense. Consider a company whose shares would be fairly valued at $10 per share based on the company's actual financial condition, but that raises new equity by selling new shares at $15 per share, based on false financial statements suggesting that the business is stronger than it actually is. The new investors would each hold claims against the company, sounding in fraud, in the amount of $5 per share they acquired.

How should that shareholder be treated if, for some reason unrelated to the use of the false financial statements, the company's business faltered and it was required to file for bankruptcy? Do they hold both equity (for the shares they own) and ordinary debt claims for the $5 share that they could have recovered in a suit for fraud outside of bankruptcy? Section 510(b) says that the answer to that question is no – their claim for fraud is subordinated and they are treated as if they held $15 worth of equity. The basic insight behind this provision is that, had the company's

---

[55] The statute provides that:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

financial statements been truthful, the investors would have been equity holders rather than creditors. That equity, to be sure, would have been more valuable than the shares they actually acquired. But the investors would still have been equity holders who, under the absolute priority rule, would be paid nothing unless and until the company's creditors were paid in full. The Third Circuit explained this point in *In re Telegroup*, where it said that Congress's judgment in enacting § 510(b) was that, as between creditors and shareholders, it made more sense to allocate the risk of fraud or illegality in the issuance of stock to the shareholders.[56]

That principle makes good sense as far as it goes. And it explains why the investors who were allegedly defrauded by the debtors here generally did not file proofs of claim. It further explains why the claims asserted by those investors who did file such claims were subordinated, and thus effectively treated as equity interests. But that principle is quite far removed from the reason why a trustee in bankruptcy is precluded from bringing a fraudulent conveyance claim for the benefit of equity holders – which is because those equity holders could not themselves have invoked the common law fraudulent conveyance remedy outside of bankruptcy.

But a defrauded investor would have been able, outside of bankruptcy, to bring an action against the recipient of a fraudulent conveyance, since outside of

---

[56] *In re Telegroup, Inc.*, 281 F.3d 133, 140-141 (3d Cir. 2002) ("Ultimately, the … proposal that inspired § 510(b) appears intended to prevent disappointed shareholders from recovering the value of their investment by filing bankruptcy claims predicated on the issuer's unlawful conduct at the time of issuance, when the shareholders assumed the risk of business failure by investing in equity rather than debt instruments."). *See also In re RTI Holding Co., LLC*, No. 20-12456 (JTD), 2021 WL 3409802 (Bankr. D. Del. Aug. 4, 2021) (applying rationale of *Telegroup*).

bankruptcy a defrauded investor is of course a creditor.[57]   And as explained above, the principle of *DSI Renal* is designed to ensure that a trustee in bankruptcy not have *greater* rights to recover against a fraudulent conveyance defendant in bankruptcy than creditors would have outside of bankruptcy.   But to apply that principle in a context in which creditors holding valid claims outside of bankruptcy are subordinated under § 510(b) would leave the trustee in bankruptcy with *lesser* rights than the creditors enjoyed before the bankruptcy filing.   Such an application would undermine, rather than serve, the principles to which the rule of *DSI Renal* is directed.

That conclusion is underscored by the text of § 510(b), which makes clear that the subordination provided for under that section is only "[f]or the purposes of distribution under this title."[58]   It therefore should not be applied for the very different purpose of reducing the liability of a fraudulent conveyance defendant.   The Court accordingly will not stay this adversary proceeding for the purpose of considering a motion for summary judgment on *DSI Renal* grounds.

---

[57] *See Dillon v. Axxsys Int'l, Inc.*, 185 F.App'x 823, 830 (11th Cir. 2006) (finding that parties who had been fraudulently induced into investing were creditors of the corporation by virtue of having rights to payment against the corporation); *In re Bayou Group, LLC*, 372 B.R. 661, 665 (Bankr. S.D.N.Y. 2007) (reaching same conclusion and collecting cases so holding); *Drivetrain, LLC v. X. Commerce, Inc.*, No. 22-50448 (CTG), 2023 WL 1804627, at *6 & n.58 (Bankr. D. Del. Feb. 7, 2023) (noting that when "an investor is fraudulently induced into making an investment based on a company's material misrepresentations, the investor immediately becomes a creditor – holding a tort claim against the company for having been defrauded into making those investments," but noting that § 510(b) may subject such a claim to subordination in bankruptcy).

[58] 11 U.S.C. § 510(b).

## II.    The defendants' motion to dismiss will be granted in part and denied in part.

Defendants also move to dismiss the complaint for failure to state a claim. While the complaint contains six counts, the claims fall into three broad categories: (1) claims for the avoidance and recovery of actual fraudulent transfers from ONH AFC to defendants pursuant to § 548(a)(1)(A), § 544(b)(1), and New York state law, (2) avoidance and recovery of constructive fraudulent transfers from ONH AFC to defendants pursuant to § 548(a)(1)(B), § 544(b)(1), and New York state law; and (3) a claim for unjust enrichment in the amount of $5,000,000.[59]

The resolution of the motion to dismiss is a straightforward matter. The claims for actual fraudulent conveyance survive only insofar as the complaint alleges facts from which one could infer that the transfer was made with the intent to hinder, delay, or defraud creditors. Such an inference can be drawn from the allegation that the debtor paid Josmic $5 million to satisfy a debt owed by Schwartz. The facts alleged in the complaint, however, provide no basis from which one could reasonably infer that the other four alleged transfers, totaling $2 million, were made with such intent. The claims for constructive fraudulent conveyance fail on account of the complaint's failure to allege insolvency. And the unjust enrichment claim fails because the defendants are not alleged to have received more than the repayment of a valid loan. Even if the payment was from the wrong party, those allegations do not give rise to a claim of unjust enrichment.

---

[59] D.I. 1 at 15-21.

### A.   The motion to dismiss claims for actual fraudulent transfer will be granted in part and denied in part.

To plead a claim for intentional (actual) fraudulent conveyance under § 548(a)(1)(A), the trustee must allege (1) that the transfer was made within two years of the petition date, and (2) the debtor made the transfer "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."[60] The Third Circuit has held that § 548(a)(1)(A) "unambiguously focus[es] solely on the intent of the debtor."[61]   Culpability or known participation on the part of the transferee is irrelevant under the statute for purposes of establishing this *prima facie* element of actual fraudulent transfer.[62]   Plaintiffs may also rely on badges of fraud to help establish intent.   The "badges of fraud" that are often considered by courts include:

> (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction.[63]

Defendants assert that the trustee has failed to state claims for actual fraudulent transfer.   Defendants argue that the complaint fails to allege facts

---

[60] 11 U.S.C. § 548(a)(1)(A).

[61] *In re Syntax-Brillian Corp.*, 573 F.App'x 154, 162 (3d Cir. 2014).

[62] *Id*. at 161-162. *See also in re Cyber Litigation, Inc.*, No. 20-12702 (CTG), 2023 WL 6938144, at *7 (Bankr. D. Del. Oct. 19, 2023) ("The intent that matters for fraudulent conveyance law is that of the transferor.   A perfectly innocent transferee that receives a fraudulent conveyance is required to return the property conveyed (or the value thereof).").

[63] *In re FTX Trading Ltd.*, No. 22-11068 (JTD), 2024 WL 4562675, at *7 (Bankr. D. Del. Oct. 23, 2024) (internal citations omitted).

sufficient to find that ONH AFC possessed actual fraudulent intent.  Defendants contend that the complaint's allegations of fraud are wholly conclusory and that the trustee's assertions of alleged badges of fraud are insufficient as a matter of law.[64]

The allegations of fraudulent intent are sufficient with respect to the alleged $5 million repayment of the loan owed by Schwartz but insufficient as to the other alleged transfers.[65]  With respect to the $5 million payment, the complaint alleges that Schwartz, the ultimate manager of ONH AFC and controller of ONH AFC's bank account, caused ONH AFC to make the $5 million payment to satisfy his personal obligation under the Josmic loan.[66]  As a matter of common sense, an allegation that the debtor's principal caused the debtor's funds to be used to repay his personal loan, on which the debtor itself was not obligated, in exchange for no other consideration beyond the paying down of the principal's loan, is sufficient to allege an actual fraudulent conveyance.  To be sure, the ultimate beneficiary of that fraudulent conveyance may have been Schwartz rather than Josmic.  But the Bankruptcy Code permits a trustee to recover a fraudulent conveyance from *either* the "initial transferee of such transfer" (here, Josmic) *or* "the entity for whose benefit such transfer was made" (here, Schwartz).[67]  Accordingly, the complaint adequately alleges that the debtor made a $5 million actual fraudulent conveyance to Josmic.

---

[64] D.I. 10 at 11-13.

[65] Defendants do not dispute that the complaint adequately alleges that the transfers took place within two years of the petition date.

[66] *See* D.I. 1 ¶¶ 83, 85.

[67] *See* 11 U.S.C. § 550(a)(1).

The remaining allegations of actual fraudulent conveyance, involving transfers that total $2 million, are insufficient. While the complaint alleges in conclusory fashion that the transfers were fraudulent, the complaint does not set forth facts that suggest the presence of badges of fraud or otherwise would permit a reader to draw a commonsense inference that the transfers were made with the intent to hinder, delay, or defraud creditors. The complaint also does not adequately tie the remaining challenged transfers to any underlying transaction or obligation. The motion to dismiss the actual fraudulent conveyance claims will accordingly be granted with respect to those transfers.

### B. The motion to dismiss the claims of constructive fraudulent transfer will be granted.

To plead a claim for constructive fraudulent conveyance under 11 U.S.C. § 548(a)(1)(B), the trustee must allege that (1) the debtor received less than reasonably equivalent value in exchange for the challenged transfer and (2) the debtor either (a) was insolvent at the date of the transfer or became insolvent as a result of the transfer, (b) was left with "unreasonably small capital" immediately after the transfer, (c) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured," or (d) "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business."[68]

---

[68] 11 U.S.C. § 548(a)(1)(B)(i)-(ii).

Because the complaint does not allege either insolvency or unreasonably small capital, the constructive fraudulent conveyance claims must fail.  The complaint offers no specific facts about the debtor's assets and liabilities at the date(s) of the challenged transfers.  Nor does it allege specific facts that would support an allegation that the debtor was left insolvent as a result of the transfers.  The complaint states that upon her appointment as manager of ONH AFC, the trustee learned that the majority of ONH AFC's funds had been withdrawn from the company's bank accounts.  But that is insufficient, on its own, to support an inference of insolvency at the time of the transfers.[69]  The complaint says nothing about the debtor's balance sheet immediately before or after the challenged transfers, or otherwise allege specific facts from which an inference of insolvency can be drawn.  And the conclusory assertion that the debtors were left with "unreasonably small capital" after each of the transfers is insufficient as a matter of law.  The motion to dismiss the constructive fraudulent conveyance claims will accordingly be granted.

### C.    The motion to dismiss the trustee's unjust enrichment claim will be granted.

To assert a claim for unjust enrichment, New York state law requires facts alleging "(1) that the defendant was benefitted; (2) at plaintiff's expense; and (3) that equity and good conscience require restitution."[70]

---

[69] *See* D.I. 1 ¶ 53.

[70] *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.,* 448 F.3d 573, 586–587 (2d Cir. 2006).

The trustee has not alleged facts sufficient to support a claim for unjust enrichment. Rather, the complaint alleges that the debtor conveyed $5 million, at the behest of Schwartz, to pay down a valid loan obligation owed to Josmic. As a general matter, the equitable remedy of unjust enrichment will not lie when the transaction at issue is the subject of a contract.[71] And while there is some uncertainty under New York law about whether unjust enrichment is available in circumstances like those alleged here, where the recipient of the payment was owed the funds under a contract, but the payor was under no contractual obligation to make the payment, the better reading of the New York case law is that in such a circumstance, the party who has been unjustly enriched is not the party who received the payment but rather the one who owed the obligation.[72] The motion to dismiss the claim for unjust enrichment will therefore be granted.

## Conclusion

For the reasons set forth above, the Court will not stay this adversary proceeding pending a motion for summary judgment. The motion to dismiss will be granted in part and denied in part. The parties are directed to settle an order so providing.

Dated: May 8, 2025

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[71] *Id.*

[72] *See Fernbach, LLC v. Capital & Guarantee Inc.*, No. 08 Civ. 1262, 2009 WL 2474691, at *4 (S.D.N.Y. Aug. 12, 2009).